Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | John W. Darrah | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 99 C 7464 | **DATE** | 4/9/2002 |
| **CASE TITLE** | ROBERTA D. GRANT vs. JACK E. POTTER | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
    ☐ FRCP4(m)  ☐ General Rule 21  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).
(10) ■ [Other docket entry]  Status hearing held. Enter Memorandum Opinion And Order. Defendant's motion for summary judgment is granted.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | |
|---|---|---|---|---|
| | No notices required. | | number of notices | **Document Number** |
| | Notices mailed by judge's staff. | | APR 10 2002 | |
| | Notified counsel by telephone. | | date docketed | |
| ✓ | Docketing to mail notices. | | | 38 |
| ✓ | Mail AO 450 form. | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | | |
| LG | courtroom deputy's initials | Date/time received in central Clerk's Office | date mailed notice mailing deputy initials | |

# UNITED STATES DISTRICT COURT,
# NORTHERN DISTRICT OF ILLINOIS,
# EASTERN DIVISION

APR 1 0 2002

ROBERTA D. GRANT,

    Plaintiff,

v.

JACK E. POTTER, Postmaster General,
United States Postal Service,

    Defendant.

Case No. 99 C 7464

The Honorable John W. Darrah

APR 1 0 2002

## MEMORANDUM OPINION AND ORDER

Plaintiff, Roberta D. Grant ("Grant"), acting *pro se*, filed a single-count amended complaint against Defendant, Jack E. Potter[1] ("Potter"), Postmaster General of the United States Postal Service, alleging discrimination based upon race, sex and national origin and retaliation under Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended 42 U.S.C. § 2000(e) *et seq.* Potter moved for summary judgment pursuant to Federal Rule of Civil Procedure 56. For the reasons that follow, Potter's Motion for Summary Judgment is granted.

## LEGAL STANDARD

Summary judgment is appropriate when there remains no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Cincinnati Ins. Co. v. Flanders Elec. Motor Serv., Inc.*, 40 F.3d 146, 150 (7th Cir. 1994). "One of the principal purposes

---

[1] On June 4, 2001, Jack E. Potter succeeded William J. Henderson as Postmaster General. In accordance with Federal Rule of Civil Procedure 25(d)(1), Jack E. Potter is automatically substituted for William J. Henderson as the Defendant in this civil action.

-1-

of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses . . . ." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Thus, although the moving party on a motion for summary judgment is responsible for demonstrating to the court why there is no genuine issue of material fact, the non-moving party must go beyond the face of the pleadings, affidavits, depositions, answers to interrogatories, and admissions on file to demonstrate, through specific evidence, that there remains a genuine issue of material fact and show that a rational jury could return a verdict in the non-moving party's favor. *Celotex*, 477 U.S. at 322-27; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254-56 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986); *Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 923 (7th Cir. 1994).

Disputed facts are material when they might affect the outcome of the suit. *First Ind. Bank v. Baker*, 957 F.2d 506, 507-08 (7th Cir. 1992). When reviewing a motion for summary judgment, a court must view all inferences to be drawn from the facts in the light most favorable to the opposing party. *Anderson*, 477 U.S. at 247-48; *Popovits v. Circuit City Stores, Inc.*, 185 F.3d 726, 731 (7th Cir. 1999). However, a metaphysical doubt will not suffice. *Matsushita*, 475 U.S. at 586. If the evidence is merely colorable or is not significantly probative or is no more than a scintilla, summary judgment may be granted. *Anderson*, 477 U.S. at 249-250.

## BACKGROUND

The undisputed facts taken from the parties' Local Rule 56.1(a) & (b) statements of material facts (referred to herein as "Pl.'s 56.1"[2] and "Def.'s 56.1"[3]) and exhibits are as follows.

---

[2] Grant did not file a Local Rule 56.1 statement of undisputed facts.

[3] The Court will not consider unsupported statements of fact or general "denials" that do not contain references to the factual record, as required by Local Rule 56.1(3). *See Bordelon v. Chicago Sch. Reform Bd. of Trustees*, 233 F.3d 524, 527 (7th Cir. 2000) (strict compliance with

Grant is a self-described "black American". (Def.'s 56.1 ¶ 5.) Grant attended junior college for two years but never earned a degree. (Def.'s 56.1 ¶ 6.) She has been employed with the United States Postal Service ("USPS") as a distribution clerk for almost twenty-one years. (Def.'s 56.1 ¶ 7; Grant Dep. at 10.)

Grant was assigned to the Irving Park Road Processing and Distribution Center ("the Irving Park facility")[4]. (Egwu Decl. ¶ 4.) Grant's immediate supervisor at the Irving Park facility, at the relevant time, was Paul Vinson ("Vinson"), who is African-American. (Def.'s 56.1 ¶ 10; Egwu Decl. ¶ 4.) Larry Egwu ("Egwu"), a native of Nigeria, was above Vinson in the chain of command. (Def.'s 56.1 ¶ 11.) While she worked at the Irving Park facility, Grant complained that Vinson denied her training to become a supervisor sometime in the summer of 1996. (Def.'s 56.1 ¶ 13.) Vinson stated that he denied her request because Grant's attendance was unsatisfactory. (Def.'s 56.1 ¶ 16.) Grant believed that her attendance was fine. (Def.'s 56.1 ¶ 17.) When Grant learned that Egwu was standing by Vinson's decision, she asked to meet with Egwu. (Def.'s 56.1 ¶ 18.) Egwu agreed, and the meeting was scheduled for September 14, 1996, at 1:00 a.m., about an hour after Grant's shift began. (Egwu Decl. ¶ 4.)

According to Grant, she reported to Egwu's office at the appointed time but returned to her work when she was paged by Vinson. (Def.'s 56.1 ¶ 19.) Egwu was in his office at this time. (Egwu Decl. ¶ 4.) When fifteen minutes had passed and Grant had not reported to his office, Egwu

---

the local rules governing summary judgment is upheld given the importance of local rules that structure the summary judgment process). It is deemed as admitted all 56.1 responses which fall into this category.

[4]The dates that Grant worked at the Irving Park Facility and the O'Hare Air Mail Facility appear to be transposed in Defendant's Statement of Material Facts as to Which There is No Genuine Dispute. The dates and workplaces as they are reported above are correct.

contacted Vinson. (Egwu Decl. ¶ 4.) Vinson told Grant that Egwu wanted to meet with her. (Def.'s 56.1 ¶ 19.) Because she was concerned about dispatching the mail in a timely manner, Grant replied, "That's okay. Just forget it." (Def.'s 56.1 ¶ 19.) Egwu then spoke to Grant by telephone and asked her why she no longer wanted to meet with him. (Def.'s 56.1 ¶ 20.) Grant replied, "I don't want to deal with you guys and your unprofessional ways." (Def.'s 56.1 ¶ 20.) Grant then hung up on Egwu. (Def.'s 56.1 ¶ 20.)

Several times later that day, Vinson approached Grant and advised her that Egwu wanted to meet with her immediately. (Def.'s 56.1 ¶ 21.) In response, Grant insisted that Vinson get her a union representative. (Def.'s 56.1 ¶ 21.) While Vinson did not refuse this demand, he did not get her a union representative. (Def.'s 56.1 ¶ 21.)

At about 3:00 a.m, Grant went to the post office lunchroom for her lunch break. (Def.'s 56.1 ¶ 22.) Shortly thereafter, Vinson arrived and asked to speak with her. (Def.'s 56.1 ¶ 22.) Grant told him "[N]ot now. I'm having lunch." (Def.'s 56.1 ¶ 22.) Egwu then came to the lunchroom, accompanied by two postal police officers, and thrust a letter at Grant. (Def.'s 56.1 ¶ 23; Bouyer Decl. ¶4; Smith Decl. ¶ 4.) Grant was shocked when Egwu told her that he wanted her removed from the premises for failing to follow instructions. (Def.'s 56.1 ¶ 23; Egwu Decl. ¶ 6.) Egwu also told Grant that she should report to work the next day. (Egwu Decl. ¶ 7.) Grant then tried to call a union representative but was unsuccessful. (Def.'s 56.1 ¶ 24.) She refused to take the letter from Egwu and sat in the lunchroom until the end of her lunch break. (Def.'s 56.1 ¶ 24.) As she left the lunchroom, Vinson, Egwu, and the postal police officers followed her. (Def.'s 56.1 ¶ 25.)

After Grant entered the elevator, two postal police officers asked, "Who is Roberta Grant?" (Def.'s 56.1 ¶ 25.) One of the officers ordered everyone off the elevator; and, while Grant was

-4-

leaving, Grant claims that the officer threw her to the floor. (Def.'s 56.1 ¶ 25.) After a scuffle, Grant was handcuffed and removed from the O'Hare Post Office. (Def.'s 56.1 ¶ 26.) Grant is "sure that that never would have happened to [her] if it wasn't not [sic] discriminatory." (Def.'s 56.1 ¶ 26.) Egwu states that Grant was treated in that fashion due to her insubordination and that he treated her no differently from similarly-situated employees. (Def.'s 56.1 ¶ 26.)

In 1997, Grant filed her first Equal Employment Office ("EEO") complaint about her removal from the Irving Park facility. (Pl.'s 56.1 Ex. 2; Grant Dep. at 12.) Grant believes that Egwu's conduct was racially motivated because she "has worked for many black managers," yet she has "never seen anything like" what Egwu did with a "black American manager." (Def.'s 56.1 ¶ 28.) She thinks that if she were white, she would have been treated differently; but she knows of no white employees who were treated more favorably under similar circumstances. (Def.'s 56.1 ¶ 28.) She believes that because Egwu is Nigerian and she "refused to have a meeting with him, that some way that did something to him because he was a Nigerian and [she] was a black American." (Def.'s 56.1 ¶ 29.) Grant also believes that Egwu's treatment of her constituted sexual harassment because, after she refused to meet with him, he was hostile toward her and interfered with her ability to do her job. (Def.'s 56.1 ¶ 30.)

Grant is aware of several other male and female black American employees who have attended supervisor training. (Def.'s 56.1 ¶ 14.) But she does not think that Vinson was responsible for approving their attendance at supervisor training. (Def.'s 56.1 ¶ 15.)

Grant was transferred to the O'Hare Air Mail Facility ("O'Hare Post Office") in February 1997. (Grant Dep. at 22.) Ruby Branch ("Branch"), an African-American, was Grant's immediate supervisor at the O'Hare Post Office. (Def.'s 56.1 ¶ 12; Branch Decl. ¶ 1.) It is Grant's

understanding that Branch and Egwu are good friends. (Def.'s 56.1 ¶ 32.) Grant also believes that Branch was aware of Grant's prior EEO activities because, when Grant introduced herself to Branch, Branch replied, "Yeah, I know all about this." (Def.'s 56.1 ¶ 40.) Branch never explained what she meant by that comment. (Def.'s 56.1 ¶ 40.)

Grant worked from late Christmas Eve to early Christmas Day in 1997. (Def.'s 56.1 ¶ 33.) According to Grant, everyone had alcohol at the O'Hare Post Office on Christmas Eve, but she did not consume any and does not know of anyone who did. (Def.'s 56.1 ¶ 33.) When Branch found alcohol at the O'Hare Post Office on that day, she called everyone into the office and asked whether anyone knew about the alcohol. (Def.'s 56.1 ¶ 34.) According to Branch, Grant was one of the employees who claimed responsibility for the alcohol. (Def.'s 56.1 ¶ 35.) However, while Grant admits that she saw "party stuff" in her unit, she denies that it was hers and insists that the first time she saw alcohol was when Branch displayed it and questioned her subordinates about it. (Def.'s 56.1 ¶ 36.) Grant was then fired for having alcohol on USPS property. (Def.'s 56.1 ¶ 37.) Two or three other employees also "got in trouble" for having alcohol on USPS property on Christmas 1997. (Def.'s 56.1 ¶ 38.) However, Grant does not know how they were disciplined or whether they engaged in EEO activity. (Def.'s 56.1 ¶ 38.) Grant is not aware of any other instances in which an employee was found with alcohol on USPS property. (Def.'s 56.1 ¶ 39.)

In January 1998, Grant filed an EEO claim in which she alleged that Branch fired her in retaliation for her prior EEO activity. (Def.'s 56.1 ¶ 41.) However, Branch denies that Grant's EEO activity had anything to do with her decision to fire Grant. (Def.'s 56.1 ¶ 42.) Branch fired every employee who was involved in the December 1997 incident involving alcohol on USPS property. (Def.'s 56.1 ¶ 43.)

-6-

Grant was allowed to return to work after signing, on April 23, 1998, an agreement ("the settlement agreement"), which provided that:

> [i]t is understood by the undersigned that this Agreement is in full and complete settlement of all outstanding complaints or appeals, in this or any other forum, filed by Ms. Grant or on her behalf relating to any matters that occurred prior to the execution of this Settlement Agreement. Ms. Grant agrees to voluntarily withdraw any outstanding complaints or appeals, and to request that any grievances be withdrawn. It is understood that settlement is contingent upon those complaints, appeals, or grievances being withdrawn.

(Pl.'s 56.1 Ex. 3.) The settlement agreement also provided that Grant signed it "without reservation, duress, or coercion on the part of anyone." (Def.'s 56.1 ¶ 46.)

As a result of the settlement agreement, Grant's discipline was reduced to a long-term suspension without pay. (Def.'s 56.1 ¶ 47.) Grant did not proceed any further with her EEO complaint concerning her firing. (Def.'s 56.1 ¶ 50.)

However, the instant action is based on Grant's removal from the Irving Park facility in 1996 and her termination in December 1998. (Def.'s 56.1 ¶ 51.) Grant now claims that she signed the settlement agreement under duress because she "needed [her] job back" and that "whatever they said [she] had to do to get [her] job back, [she] did." (Def.'s 56.1 ¶ 52.) Several union representatives worked with Grant on the settlement. (Def.'s 56.1 ¶ 45.) Grant's union representatives and a USPS plant manager told her that she had to sign the settlement agreement in order to return to work. (Def.'s 56.1 ¶ 53.)

## DISCUSSION

Defendant argues that summary judgment is appropriate because (1) all of Grant's claims are barred by her settlement agreement with the USPS and (2) even if her claims were not so barred, Grant cannot establish a *prima facie* case of discrimination based on sex, race, or national origin.

Grant argues that summary judgment is inappropriate because (1) she signed the settlement agreement under duress and (2) Egwu made a disparaging and degrading sexual comment about her.

An employee may waive her federal civil rights claims "in private settlements with [her] employers, provided that [her] consent to a release is both knowing and voluntary." *Pierce v. Atchison, Topeka & Santa Fe Ry. Co.*, 65 F.3d 562, 570 (7th Cir. 1995) (*"Pierce I"*). Whether a release is knowing and voluntary is based on the totality of the circumstances. *Pierce I*, 65 F.3d at 571. In determining the validity of a release, courts will consider the following factors:

> (1) the employee's education and business experience; (2) the employee's input in negotiating the terms of the settlement; (3) the clarity of the agreement; (4) the amount of time the employee had for deliberation before signing the release; (5) whether the employee actually read the release and considered its terms before signing it; (6) whether the employee was represented by counsel or consulted with an attorney; (7) whether the consideration given in exchange for the waiver exceeded the benefits to which the employee was already entitled by contract or law; and (8) whether the employee's release was induced by improper conduct on the defendant's part.

*Pierce I*, 65 F.3d at 571 (citations omitted). "The party seeking to enforce a waiver of [federal anti-discrimination claims] . . . bear[s] the burden of proving knowing and voluntary consent." *Pierce v. Atchison Topeka & Santa Fe Ry. Co.*, 110 F.3d 431, 438 (7th Cir. 1997) (*"Pierce II"*).

Grant is a high school graduate and attended junior college for two years. At the time she signed the settlement agreement, she had worked for USPS for about eighteen years. While it is unclear what Grant's input into negotiating the terms of the settlement was or how much time she had to deliberate, it is clear that she read and considered and understood the terms of the settlement agreement. At her deposition, Grant testified that she understood the settlement agreement to mean that she "had to drop all of – everything [she] had filed against them in EEO." (Grant Dep. at 19.) Grant also testified that she understood the settlement agreement to mean that she agreed not to

pursue "all complaints". (Grant Dep. at 21.) The settlement agreement is clear, and the release is stated in plain English. Grant's understanding of the settlement agreement further supports the clarity of the agreement. While Grant was not represented by counsel, she was represented by several union representatives. (Grant Dep. at 14.) USPS had no contractual or legal obligation to rehire Grant. Finally, the evidence presented does not indicate that any improper conduct by USPS induced Grant to sign the release. Based on the totality of the circumstances, the settlement agreement was a valid release of Grant's federal anti-discrimination claims.

Grant argues that she signed the settlement agreement under duress due to the fact that she needed this job to take care of her mother who was terminally ill.

The defense of duress is:

> not shown by the fact that one was subjected to mere annoyance, vexation, personal embarrassment, a difficult bargaining position or the pressure of financial circumstances. There must have been some imposition, oppression, undue influence, or the taking of undue advantage of the business or financial stress or extreme necessities or weakness[es] of another.

*Pierce I*, 65 F.3d at 569 (quoting *Herget Nat'l Bank v. Theede*, 181 Ill. App. 3d 1053, 1057 (1989) (internal citations and quotations omitted)). "[O]ne cannot successfully claim duress as a defense to a contract when he had an alternative to signing the agreement." *Pierce I*, 65 F.3d at 569 (citations omitted).

Grant has not established the defense of duress. The fact that Grant needed a job to meet her financial obligations does not establish the defense of duress. Grant has not presented any evidence of imposition, oppression, or undue influence by USPS or that USPS took advantage of her business or financial stress or her extreme necessities or weaknesses. Furthermore, Grant could have rejected the settlement agreement and pursued her discrimination claims. She chose not to, and "this choice

-9-

negates any showing of duress." *Pierce I*, 65 F.3d at 569.

Even if the settlement agreement did not bar Grant's claims, Defendant would still be entitled to summary judgment because Grant cannot prove that she was discriminated against based on her race, sex, or national origin.

Discrimination under Title VII may be proven through direct evidence or indirectly through the burden-shifting mechanism of *McDonnell Douglas*.[5] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Grant has not presented any direct evidence of discrimination. To prove discrimination indirectly, Grant must establish that: (1) she is a member of a protected class, (2) she suffered an adverse employment action, (3) she was meeting her employer's legitimate performance expectations, and (4) her employer treated similarly situated employees who were not in the protected class more favorably. *Maarouf v. Walker Manufacturing Co.*, 210 F.3d 750, 751 (7th Cir. 2000).

Grant has not presented any evidence that employees outside the protected class were treated more favorably. In fact, the evidence presented establishes that other black employees were selected for and received supervisor training. Furthermore, Grant has not presented any evidence that any employees who were outside the protected class and who were insubordinate to their supervisor were not escorted off USPS property by postal police. Therefore, Grant has not proved that she was discriminated against based on her sex, race or national origin, and Defendant is entitled to summary

---

[5] Under the *McDonnell Douglas* framework, a *prima facie* case of employment discrimination creates a rebuttable presumption that the employer's actions, if unexplained, were the result of impermissible factors and shifts the burden of production to the employer to articulate some legitimate, nondiscriminatory reason for its actions; if the employer satisfies that burden, Plaintiff must then show that the articulated reasons were pretextual. *Hong v. Children's Memorial Hospital*, 993 F.2d 1257, 1261 (7th Cir. 1994).

judgment on these claims.

Grant also argues that Egwu subjected her to *quid pro quo* sexual harassment. Grant argues that Egwu denied her request for a union steward so that she would have to meet with him alone. Grant further argues that Egwu's later statement in a memorandum about the events on September 14, 1996 to his supervisor reveals that Egwu intended to require an oral sex act in exchange for supervisor training.

To maintain an actionable claim of sexual harassment, "an employee must demonstrate that her . . . supervisor harassed her because of her sex." *Hilt-Dyson v. City of Chicago*, No. 01-2095, 2002 WL 272774 at *4 (7th Cir. Feb. 27, 2002). Grant cannot establish that Egwu's comment was because of her sex. Grant believes that the following statement by Egwu constitutes sexual harassment: "Mr. Vinson told me that she said that every thing [sic] is all right now and does not wish to exercise her open door policy rights any more. I, however, wanted to hear from the proverbial 'horses [sic] mouth' so I can remove this from my suspense file." (Pl.'s 56.1 Ex. 17.) Egwu's comment indicated his intention, on September 14, 1996, to hear that Grant no longer wanted to pursue a meeting with him "straight from the horse's mouth," that is, directly from the source, Grant. Egwu's comment was not disparaging sexual commentary on Grant's anatomy. Egwu's comment about the horse's mouth was not because of Grant's sex and, therefore, cannot form the basis of her sexual harassment claim.

A retaliation claim may be proved by indirect evidence under the burden-shifting method of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Kersting*, 250 F.3d at 1117. In order to prove a claim of retaliation under Title VII, Grant must prove that: (1) she engaged in statutorily protected expression, (2) she suffered an adverse employment action, and (3) there is a causal link

between the protected expression and the adverse employment action. *Stutler v. Ill. Dep't of Corrections*, 263, F.3d 698, 702 (7th Cir. 2001) (citations omitted); *see also Sweeney v. West*, 149 F.3d 550, 557 (7th Cir. 1998) (holding that "the employer's adverse action [must] follow[] fairly soon" after the employee's protected expression to establish the required nexus for retaliation in violation of Title VII).

However, even if Grant could establish a *prima facie* case of retaliation, Grant has not established that Defendant's legitimate nondiscriminatory reason for terminating her, possession of alcohol on USPS property, was pretextual. Grant has not offered any evidence from which a rational jury could conclude that USPS did not honestly believe its proffered reason for discharging her. *See Debs v. Northeastern Illinois Univ.*, 153 F.3d 390, 396 (7th Cir. 1998) (holding an honest belief in the nondiscriminatory reason offered by the decision-maker will be sufficient even if the reasons are foolish, trivial, or baseless). Furthermore, the fact that the other employee who possessed alcohol on USPS property was terminated supports the conclusion that USPS honestly believed its legitimate nondiscriminatory reason for her discharge.

Therefore, Defendant is entitled to summary judgment on all of Grant's claims.

## CONCLUSION

For the reasons stated herein, Defendant's Motion for Summary Judgment is granted.

**IT IS SO ORDERED.**

John W. Darrah, Judge
United States District Court

Date: April 9, 2002